NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0821n.06

**Case No. 14-5270**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Oct 29, 2014

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| PECOLA COOK and STARSKY COOK, | ) | |
|     Individually and as Administrators of | ) | |
| THE ESTATE OF ROLAND | ) | |
| CAMPBELL | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Plaintiffs-Appellants, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| v. | ) | |
| | ) | |
| RONNIE J. BASTIN, Individually and as | ) | |
|     Police Chief for Lexington-Fayette | ) | O P I N I O N |
| Urban County Government, *et al.* | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE: DAUGHTREY, McKEAGUE, and WHITE, Circuit Judges.**

**McKEAGUE, Circuit Judge.** On April 18, 2010, Roland Campbell, a young man with nonverbal autism and severe mental retardation, committed several acts of property destruction and assaulted his caretaker. The police were called and an altercation broke out when Campbell, already on the ground, tried to break free of his handcuffs. Officers held onto Campbell's arms and legs and a caretaker held onto his waist. No takedown occurred, no weapons were used, no punches were thrown. At some point, Campbell fell unconscious and died. We must decide whether the officers used excessive force against Campbell. Because we find the officers' decision to handcuff and subdue Campbell reasonable under

the circumstances, we affirm the district court's grant of summary judgment to the officers on qualified-immunity grounds.

**I.**

The parties agree on the events leading up to the altercation. Roland Campbell, who was 21 years old at the time of his death, suffered from nonverbal autism and severe mental retardation. Though he had no expressive language, Campbell could follow one-step directions. In September 2009, Campbell became a full-time resident at Adult Daycare of Lexington, Inc. ("ADC"), a group home in Lexington, Kentucky, for physically and mentally disabled adults. Campbell's time at ADC was not incident-free. The Complaint refers to "agitation, physical aggression, sexual acting out and stripping"; property damage, including destroying a closet door; and other behaviors, including open urination, nakedness, and defecation within the home. (R. 1-1, PageID # 25–27.) The Complaint also mentions "increased extreme agitation including property damage, self-injurious behavior and aggression toward others in the days leading up to [Campbell's] death[.]" (R. 1-1, PageID # 24–25.)

On April 18, 2010, around 1 PM, Campbell woke up from a nap feeling agitated. John Dickey was the only staff member on duty. Two other residents were at home. Campbell stripped naked and ran around uncontrollably, at one point jumping out a window before Dickey escorted him inside. Campbell engaged in extensive property damage, turning over a dresser, TV, and refrigerator, ripping a toilet out of the floor, and destroying his bed and dresser. Unable to control the situation, Dickey called for assistance at around 2:30 PM.

Eric Hatter, ADC's Crisis Manager, arrived roughly 15 minutes later. He found Campbell naked in his bedroom attempting to break the bed and window blinds. Campbell

walked up to Hatter and grabbed him by the shirt. A short time later, Campbell approached Hatter again, grabbing Hatter's shirt and ripping it. Hatter continued his attempts to calm Campbell and administered an "as-needed" medication for Campbell's agitation. Instead of calming down, Campbell broke an electrical socket and dug his fingers into the socket, lacerating his fingers. Campbell then jumped on the back of his dresser, shattering a glass ceiling fixture. At about 3:40 PM, Hatter had staff members call 911.

Officer Derrick Wallace of the Lexington-Fayette Urban County Police was dispatched. He was told the situation involved a person with mental disabilities. When Wallace arrived, he took note of Hatter's torn and bloody shirt. Hatter told Wallace that he had an out-of-control person who needed to be taken to Eastern State Hospital, a mental facility. Hatter at no time explained that Campbell was nonverbal. Wallace found Campbell digging his fingers into the electrical socket. According to Wallace, "[i]t was obvious that [Campbell] was a danger to himself and possibly others given what I had seen while I was there just from the destruction of the room, and Mr. Hatter's … clothing and his demeanor told me that he was obviously a danger to others as well." (R. 128-6, Wallace Dep., PageID # 1760.) Wallace called for backup.

Officer Matthew Smith arrived minutes later and together, they approached Campbell. Hatter asked whether he should accompany them. The officers indicated that Hatter could be useful. As the men approached, Wallace began calmly speaking to Campbell and Campbell was handcuffed without incident. While they waited for a medical transport unit, Campbell began to "step in place or dance around a little bit" and so the officers had Campbell sit on the floor. (R. 128-6, Wallace Dep., PageID # 1770.) Campbell did not struggle as the officers placed him in a sitting position. Suddenly, Campbell began "kind of moving around

a whole lot," (R. 128-6, Wallace Dep., PageID # 1770), and rolled over onto his right side. Campbell then began thrashing and kicking, making grunting sounds as he tried to free himself from the handcuffs. At some point, Campbell rolled himself into a face-down or prone position. Still thrashing and kicking, Campbell attempted to scoot on his stomach with his legs and arms toward the doorway.

At this point, the situation escalated and a physical altercation began as the officers and Hatter tried to immobilize Campbell with Dickey observing. During the altercation, Wallace was kneeling next to Campbell holding onto Campbell's arms or shoulders, Smith was squatting beside Campbell holding onto his feet or legs, and Hatter was on his knees hugging Campbell around the lower back or waist with his chest above Campbell's lower back or waist. No weapons were used and the officers and Hatter did not punch, body-slam, or kick Campbell. Though the Estate disagrees, the record also shows that the officers and Hatter were never directly on top of Campbell.

During the struggle, Campbell somehow pulled the men past the doorway and into the hallway. The struggle continued, and Campbell freed one of his hands from the handcuffs. Then, as Wallace describes it, Campbell "proceed[ed] to pick himself and everybody up off the ground with the one hand about three or four inches[.]" (R. 128-6, Wallace Dep., PageID # 1778.) Campbell closed his eyes, took a deep breath, and collapsed, falling unconscious. Campbell was rushed to the hospital and pronounced dead at 4:30 PM. The autopsy report lists the cause of death as "acute cardiorespiratory failure" due to "acute hypoxia dehydration, and physical exhaustion," "acute sympathomimetic intoxication," and "autism-induced excited delirium during prone restraint." (R. 136-2, PageID # 2044.)

Campbell's Estate initiated this action against ADC, various employees of ADC, Officer Wallace, Officer Smith, and Chief of Police Ronnie Bastin. The Estate settled with ADC and the ADC employees. Only the § 1983 claims reached the summary-judgment stage: excessive force and state-created danger with respect to Wallace and Smith and failure to supervise with respect to Chief Bastin. The Estate and the police defendants brought cross-motions for summary judgment. The police defendants argued that qualified immunity shielded them and, in the alternative, that no reasonable jury could find a violation of Campbell's constitutional rights. The district court granted summary judgment in favor of the police defendants. It held that the record did not support a clearly established constitutional violation and thus, the police defendants were entitled to qualified immunity.

The Estate timely appealed.

## II.

We conduct de novo review of a district court's grant of summary judgment on qualified-immunity grounds. *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 444 (6th Cir. 2012). We must affirm a grant of summary judgment if we determine that the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making that determination, we must construe all evidence and draw all reasonable inferences in favor of the nonmoving party. *Id*.

The Estate sued the police defendants under 42 U.S.C. § 1983. Section 1983 provides a private cause of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or federal statute. The district court awarded summary judgment to the police defendants, finding that the police defendants

were entitled to qualified immunity. Qualified immunity is an affirmative defense that shields a government official from liability for civil damages resulting from his performance of discretionary functions. *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 818 (1982). An official is entitled to qualified immunity if the facts, taken in the light most favorable to the plaintiff, do not show that the official's conduct violated a federal right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Alternatively, an official is entitled to qualified immunity even if he violates a federal right so long as the right was not "clearly established," meaning that a reasonable person in the official's position would not have known the alleged conduct to be unlawful. *Id*.

The parties do not dispute that Campbell was "seized" within the meaning of the Fourth Amendment. *See Brendlin v. California*, 551 U.S. 249, 254 (2007). The Estate alleges that the officers violated Campbell's Fourth Amendment right to be free from excessive force in two ways: by handcuffing Campbell and by subduing Campbell after he resisted his handcuffs.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation removed). The reasonableness of the use of force depends on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Though the *Graham* factors guide the reasonableness inquiry, "the ultimate question" is "whether the totality of the circumstances justifies a particular sort of

seizure." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2000) (internal quotation removed).

### III.

### A.

The Estate first argues that genuine disputes of material fact should have precluded the district court from granting summary judgment to the police defendants. It argues that genuine disputes were created by the Peters Report, which concluded that the officers' conduct was improper, and by factual discrepancies concerning the officers' and Hatter's conduct. We disagree because the Peters Report provides no facts or analysis bearing on the reasonableness of the officers' conduct and the deposition testimony and day-of reports recounting the altercation with Campbell are consistent.

*Peters Report.* The Estate's police-practices expert, John Peters, submitted a report of his findings to the district court. The report contains two basic findings: the officers "should have" left Campbell unrestrained and the officers "should have known" that Hatter "should not have been lying on top of [] Campbell." (R. 134-4, PageID # 2174, 2179.) Peters discusses what the officers "should have" done or "should have" known. In essence, Peters suggests that a better approach was available to the officers. The Fourth Amendment, however, does not require police officers to take the better approach. It requires only that they take a reasonable approach. *See United States v. Walker*, 615 F.3d 728, 732 (6th Cir. 2010) ("Outside the scope of the warrant requirement, the Fourth Amendment demands neither best approaches nor formulaic adherence to one … method over another[.]"). Thus, the Peters Report fails to supply facts or analysis relevant to the question at hand—the question of reasonableness.

*Deposition Testimony and Day-Of Reports.* The Estate argues that the record supports two theories for what happened during the altercation with Campbell: either Hatter and the officers subdued Campbell without pressing on his back or, as the Estate suggests, "the officers and Hatter *did* get on and apply weight to Campbell's back." In arguing its view of the record, the Estate seeks to bring this case closer to the facts of *Champion*, where we held that "[c]reating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable force." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004).

The district court rejected the Estate's view of the record, finding "the conclusion that any of the men were on Campbell's back and applying asphyxiating pressure … unsupported by the record." (R. 171, PageID # 2863.) We have made our own review of the record, and we agree with the district court. The record shows that the officers were kneeling and squatting beside Campbell's body, not putting their weight on Campbell's back, and that Hatter, regardless of how he was positioned, was also not putting his weight on Campbell's back.

While Campbell was face-down on the floor kicking and thrashing, Wallace was kneeling to Campbell's left holding onto Campbell's arms or shoulders. Wallace's police report, Hatter's deposition, and Smith's deposition all state that Wallace was kneeling. (*See* R. 145-7, Wallace Police Rep., PageID # 2504; R. 128-2, Hatter Dep., PageID # 1670; R. 128-5, Smith Dep., PageID # 1733.) Dickey's deposition and Wallace's deposition clarify that Wallace was kneeling not on Campbell, but on the floor next to Campbell. (*See* R. 128-3, Dickey Dep., PageID # 1691; R. 128-6, Wallace Dep., PageID # 1774.) The Wallace and Hatter depositions show that Wallace was holding onto some part of Campbell's arms or

shoulders. (*See* R. 128-6, Wallace Dep., PageID # 1776; R. 128-2, Hatter Dep., PageID #1669.)

Meanwhile, Smith was squatting beside Campbell holding onto his feet or legs. Hatter's deposition states that Smith was squatting down. (R. 128-2, Hatter Dep., PageID # 1670.) Wallace's deposition and police report state that Smith was holding onto Campbell's feet, (R. 145-7, Wallace Police Rep., Page ID # 2503–04; R. 128-6, Wallace Dep., PageID # 1776), while Smith's deposition states that he was holding onto one of Campbell's legs, (R. 128-5, Smith Dep., PageID # 1733).

The record is the most ambiguous in regards to Hatter. But even then, the relevant things remain clear: Hatter was not lying on top of Campbell or pressing his weight on Campbell. The Estate takes fault with the district court for failing to consider the police reports and Dickey's ADC report, but those reports do not state that Hatter was lying on top of Campbell or applying asphyxiating pressure. In fact, Wallace's police report expressly states that Campbell's airways did not appear obstructed. (R. 145-7, Wallace Police Rep., PageID # 2504.) The closest the police reports come to implying that Hatter was on top of Campbell is Wallace's statement that Hatter was "on" Campbell's back. (R. 145-7, Wallace Police Rep.. PageID # 2503.) Dickey's ADC report uses similar language. (R. 143-2, Dickey ADC Rep., PageID # 2450.)

The Estate assumes that being "on" Campbell's back unequivocally means that Hatter was on top of Campbell. It could mean that, but it could also mean that Hatter was off to Campbell's side with his arms wrapped around Campbell's waist and his body hovering above Campbell's back. Wallace's and Dickey's statements simply do not establish what the Estate wants them to establish.

If all the record contained were statements about Hatter being "on" Campbell, we might be inclined to find a genuine dispute. But these statements are not all we have to rely upon. The depositions make clear that while Hatter was "on" Campbell, he was not lying on top of Campbell or pressing his weight into Campbell. Hatter testified that he was kneeling on the floor, holding Campbell by the waist. (R. 128-2, Hatter Dep., PageID # 1666.) Dickey's testimony also places Hatter near Campbell's waist and confirms that Hatter did not place his body weight on Campbell. (R. 128-3, Dickey Dep., PageID # 1691–92, 1704.) Smith testified that Hatter was on his knees with his arms wrapped around Campbell and that Hatter was not on top of Campbell. (R. 128-5, Smith Dep., PageID # 1733–34.) Lastly, Wallace testified that Hatter was not on top of Campbell. (R. 128-6, Wallace Dep., PageID # 1776–77.)

In short, there is no evidence to suggest that the officers or Hatter were on top of Campbell, as the accounts consistently place them kneeling and squatting beside Campbell.

**B.**

The Estate next argues that, even if no genuine disputes of material fact exist, the district court erred in deciding that no reasonable jury could find that handcuffing and immobilizing Campbell violated the Fourth Amendment. We perceive no error in the district court's reasoning.

*Handcuffing Campbell.* First, we agree with the district court that the officers did not use excessive force in handcuffing Campbell. The record shows that Campbell was handcuffed without incident and even that Smith adjusted the handcuffs for Campbell's comfort. The Estate has not alleged that the handcuffs were unnecessarily tight, *c.f. Burchett*

*v. Kiefer*, 310 F.3d 937, 944–45 (6th Cir. 2002), or that the officers pushed or shoved Campbell into the handcuffs.

Instead, the Estate suggests that handcuffing Campbell was excessive force because it was unreasonable to handcuff Campbell when he was calm. The Court disagrees. Even if Campbell was calm at the time of handcuffing, the officers had every reason to believe that Campbell might become violent at any time and without any warning. The officers knew they were dealing with an "out of control" person and upon entering the home, they saw both the property destruction Campbell had wreaked and the signs of physical violence with Hatter—Hatter's ripped and bloody shirt. It was entirely reasonable to think that handcuffing Campbell would be safer for the officers, the staff members, and the other residents.

*Subduing Campbell.* We also agree with the district court that the officers did not use excessive force in subduing Campbell. The *Graham* factors support this finding. First, Campbell had engaged in significant destruction of private property and physically assaulted Hatter. Both facts were known to the officers from visual inspection. Second, Campbell posed an immediate threat to himself, the officers, the staff members, and the other residents. Though Campbell was handcuffed, Campbell was attempting to free himself from those handcuffs. *See Kijowski v. Niles*, 372 F. App'x 595, 600 (6th Cir. 2010) (although force against a nonresistant person is generally unreasonable, it can become reasonable in case of a "compelling justification" like active resistance or potential escape).

This is not a situation where the person is handcuffed and nonresistant before the physical altercation begins. In those situations, this Court has found the handcuffed suspect not to pose an immediate threat. *See, e.g.*, *Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009). Here, Campbell *was* trying to escape his handcuffs, and the officers faced

the possibility of a volatile, aggressive man escaping from his restraints. *Cf. McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (finding the need for force "nonexistent" where the individual "was handcuffed and . . . *not trying to escape or to hurt anyone*") (emphasis added).

Third, Campbell was attempting to evade his restraints when the officers and Hatter tried to immobilize him. Though Campbell may not have been "attempting to evade arrest," per *Graham*, 490 U.S. at 396, what is relevant is that he was attempting to evade his handcuffs, a handcuffing which, as discussed, was constitutionally reasonable.

Our finding that the officers acted reasonably is confirmed by the totality of the circumstances. If Campbell successfully freed himself from his handcuffs, he would have been able to engage in the same violent and destructive behaviors as earlier that day. Further, this is not a takedown case. Campbell sat on the floor without incident and rolled himself onto his side and then into a prone position. These facts distinguish this case from the Sixth Circuit cases cited by the Estate, where the officers did tackle the victim to the ground. *See Burgess v. Fischer*, 735 F.3d 462, 469 (6th Cir. 2013); *Martin v. City of Broadview Heights*, 712 F.3d 951, 954 (6th Cir. 2013); *Griffith v. Coburn*, 473 F.3d 650, 653 (6th Cir. 2007); *Champion*, 380 F.3d at 897.

It was only after Campbell decided to resist his handcuffs, from his self-imposed prone position, that the officers had reason to subdue him. Given Campbell's positioning, it is reasonable that Officer Wallace would try to immobilize Campbell's arms to stop him from removing the handcuffs. It is also reasonable that Officer Smith would try to immobilize Campbell's legs to stop him from kicking them. Lastly, it is reasonable that

Hatter would try to immobilize Campbell's waist to stop Campbell from scooting away on his stomach.

Perhaps not all three men were needed to stop Campbell, but the reasonableness of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. While the degree of force may not have been necessary in hindsight, we also cannot say it was gratuitous. *See Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010). The officers did not use weapons. *Cf. Champion*, 380 F.3d at 901. The officers did not punch Campbell, choke him, or strike him with body blows. *Cf. Martin*, 712 F.3d at 955; *Griffith*, 473 F.3d at 653. Rather, the officers used a degree of force reasonably related to the threat Campbell posed. For these reasons, we affirm the district court's decision that the officers were entitled to qualified immunity on the Estate's excessive-force claim.

## C.

The Estate also brings a failure-to-train claim against Chief Bastin. The Estate alleges that Chief Bastin failed to properly supervise, discipline, and control police officers like Wallace and Smith in responding to crisis situations involving the mentally disabled. As a result, the Estate alleges, Campbell's Fourth Amendment rights were violated. This Court has consistently held that "a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006). Because Smith and Wallace did not violate Campbell's constitutional rights, the claim against Chief Bastin must necessarily fail and we affirm the district court's grant of summary judgment on the failure-to-train claim.

**D.**

Lastly, the Estate alleges that the officers violated Campbell's due process rights because the officers' decision to let Hatter, a private citizen, help restrain Campbell led to a state-created danger. A state-created danger requires "[1] an affirmative act that creates or increases the risk, [2] a special danger to the victim as distinguished from the public at large, and [3] the requisite degree of state culpability." *McQueen*, 433 F.3d at 460 (citing *Kallstrom v. City of Columbus*, 136 F.3d 1066–67 (6th Cir. 1998)). We agree with the district court that the record does not show the officers acted with the requisite degree of state culpability. We assume, without deciding, that the appropriate standard of culpability is the deliberate-indifference standard. To be deliberately indifferent, a government official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 469 (internal citations omitted).

Here, the officers had every reason to believe that Hatter's assistance would lessen the risk to Campbell, not increase it. The officers knew they were dealing with a mentally disabled person and that Hatter had knowledge of that disability and of Campbell generally. Hatter was also a crisis manager, specially trained to handle out-of-control residents like Hatter. The Estate does not point to facts known to the officers from which they should have inferred that Hatter's assistance would be a danger. Accordingly, we affirm the district court's grant of summary judgment on the state-created-danger claim.

**III.**

Campbell's death at the young age of 21, following a lifetime of severe mental disabilities, was tragic. However, the sympathy we feel for his family does not change the

facts: the officers acted reasonably in what was a volatile situation involving a man whose disabilities had made him violent toward his caretakers and a clear threat to others. For the reasons set forth above, we **AFFIRM** the district court in all respects.

**HELENE N. WHITE, Circuit Judge** (dissenting). I respectfully dissent. The district court improperly found as fact that "the officers positioned themselves in a way that they were not applying direct pressure to Campbell's back or blocking his airways," PID 2865, when the evidence on that point was conflicting.

Several hours after the incident, Officer Bauman, who had arrived on the scene after Defendant Smith, stated that Hatter was "straddling" Campbell and "holding his shoulders to the ground." PID 2504. Defendant Smith stated on the day of the incident that Hatter "bear hugged Mr. Campbell holding him to the floor." PID 2502. And Defendant Wallace stated that Hatter "was on Campbell's back, Officer Smith was holding Mr. Campbell's feet, and I was knelt down on the blanket holding Mr. Campbell's right shoulder. Mr. Campbell was struggling harder and harder to get up." PID 2503. Summary judgment was improper given the conflicting testimony regarding whether weight or pressure were applied to Campbell's back as he lay in prone restraint. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also King v. Taylor*, 694 F.3d 650, 663 (6th Cir. 2012) (reversing grant of summary judgment in officer's favor in excessive-force case, observing, "What exactly happened just before King was shot is a question for the jury, as both sides' theories of what transpired are sufficiently supported by evidence in the record.").

I also disagree with the majority's characterization of Dr. Peters's report as lacking "facts or analysis bearing on the reasonableness of the officers' conduct." Maj. Op. at 4. Dr. Peters's report is not conclusory, *see Williams v. Ford Motor Co.*, 187 F.3d 533, 543-44 (6th Cir. 1999) (a conclusory expert report is insufficient to defeat summary judgment); it discusses Defendants' training in managing the mentally disabled, describes Defendants' conduct during the incident based on their own reports and reports of others at the scene, and sets

forth a timeline of the incident based on those reports. Dr. Peters opined that Defendants acted unreasonably by 1) unnecessarily escalating the situation by confronting Campbell, and 2) failing to identify, despite their training, that Campbell was in medical distress (suffering from excited delirium) and that the situation was a **medical** emergency necessitating medical attention. On the latter point, Hatter told Defendant Wallace when he arrived on the scene that Campbell should be taken to Eastern State Hospital, a mental-health facility. PID 2845. But Defendants did not summon medical help until after Campbell stopped breathing, around 3:55 p.m. PID 1768-69, 1460.

Given Dr. Peters's report and the factual record on which it is based, I conclude that the reasonableness of Defendants' use of force was a question for the jury, and would reverse.