DISSENT
KAREN NELSON MOORE, Circuit Judge,
dissenting.
Our circuit law clearly states that when an individual “exhibit[s] conspicuous signs that he [is] mentally unstable” and is “unarmed,” “Champion require[s] the officers to de-escalate the situation and adjust the application of force downward.” Martin v. City of Broadview Heights, 712 F.3d 951, 962 (6th Cir. 2013) (quoting Champion v. Outlook Nashville, Inc., 380 F.3d 893, 904 (6th Cir. 2004)). There are disputed facts as to whether Roell was unarmed and as to how aggressively Roell was acting, which determine how much force was appropriate. Although the law governing this case is clear, the facts surrounding Roell’s death are not. The district court erred by granting summary judgment on Nancy Roell’s § 1983 claim against Deputies Alexander, Dalid, and Huddleston. I would reverse summary judgment on this claim, and I respectfully dissent.
I. GOVERNING LAW
Because the law governing this case is clearly established and straightforward, I begin by setting out the basic legal principles that govern this case. First, I agree with the majority’s recitation of the familiar summary-judgment standard, although not with its application of the standard to this case. See Maj. Op. at 479-80. Second, I agree with its summary of the Graham-factors. See Maj. Op. at 480-81 (citing Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).
As for the law at the heart of this matter, I cannot agree with the majority’s characterization. Sixth Circuit cases clearly establish that officers must “take into account ‘the diminished capacity of an unarmed detainee ... when assessing the amount of force exerted.’” Martin, 712 F.3d at 962 (quoting Champion, 380 F.3d at 904). Martin states the rule very simply: When an individual “exhibit[s] conspicuous signs that he [is] mentally unstable” and is “unarmed,” “Champion require[s] the officers to de-escalate the situation and adjust the application of force downward.” Id.; see also Landis v. Baker, 297 Fed.Appx. 453, 465 (6th Cir. 2008) (“A determination of the reasonableness of the defendant officers’ conduct must take into account the fact that at the time of the fatal struggle, the defendant officers had reason to believe that [the arrestee] was either on drugs or mentally unstable and they knew that he was unarmed.”). If it is apparent to officers that an individual is unarmed and mentally unstable, then the officers must de-escalate and may not use as much force as would be permissible when confronted with an individual who was either mentally stable or armed.
While the majority acknowledges that Champion mandates that “[t]he deputies were ... required to take into account Roell’s diminished capacity before using force to restrain him,” it essentially brushes this requirement aside by asserting that “no caselaw supports Nancy Roell’s assertion the deputies were prohibited from using any physical force against Roell before first attempting alternative de-escalation techniques.” Maj. Op. at 482. I agree that the deputies were not necessarily prohibited from using any physical *491 force on Gary Roell, but that point is irrelevant to this case. The question in this case is whether the officers complied with their obligation, under Champion and Martin, to adjust their use of force downward. Even if the officers were permitted to use some physical force, they could have violated Champion and Martin by failing to adjust the level of force downward.
II. APPLICATION OF THE CLEARLY ESTABLISHED LAW TO THE FACTS OF THIS CASE
There are several unresolved questions of fact relevant to whether the officers had, and, if so, whether they complied with, an obligation to adjust the level of force downward. There are some basic facts that I agree are not in dispute. No one disputes that Roell had long lived with chronic, severe mental illness, including schizoaffective disorder and delusional disorder, nor does anyone dispute that when he went off his medication he could become unpredictable, dangerous, and violent. R. 98 (N. Roell Dep. at 72, 97, 167) (Page ID #4613, 4538, 4608). No one disputes that at 2:30 a.m. on August 13, the Roells’ neighbor, Rachana Agarwal, woke up to a loud noise and found Roell standing at Agarwal’s window wearing only a t-shirt, nude from the waist down. R. 90 (Agarwal Dep. at 10) (Page ID #3765); R. 77 (Huddleston Dep. at 66) (Page ID #493). Scared, Agarwal called 911 and said that her neighbor was “acting crazy.” R. 90 (Agarwal Dep. at 27) (Page ID #3782). There is no dispute that when the officers arrived oh the scene, they wrestled with Roell and tased him multiple times before eventually subduing him and handcuffing him with two sets of handcuffs and shackles. R. 77 (Huddleston Dep. at 98-100, 117-19) (Page ID #525-27, 544-46). There is also no dispute that Roell stopped breathing while he was shackled, that he never regained consciousness, and that he was pronounced dead at the hospital. See R. 96-1 (Death Record) (Page ID #4286).
Beyond these basic facts, there are many disputes over important details of the events leading to Roell’s death. First, there is a fact question as to whether Roell was armed, given that he was holding a hose and a hanging planter but may not have been using these items as weapons. Second, there is a fact question as to how aggressively Roell acted when he approached the officers. Without resolving these factual disputes, it is impossible to know whether the amount of force was appropriate under the circumstances.
A. We do not know whether Gary Roell was unarmed
There is a fact question as to whether Roell was unarmed under Ohio law. Determining whether Roell was unarmed is crucial, because if Roell was unarmed, the Champion/Martin rule would apply and require the officers to adjust the level of force downward. If Roell was armed, the Champion/Martin rule would not apply.
The majority correctly notes that Ohio law “defines a deadly weapon as ‘any instrument, device, or thing capable of inflicting death, and designed or specially adaptable for use as a weapon, or possessed, carried, or used as a weapon.”’ Maj. Op. at 481 (quoting In re Fortney, 162 Ohio App.3d 170, 832 N.E.2d 1257, 1268 (2005)). The hose and peat-moss hanging planter are not instruments “designed or specially adaptable for use as a weapon” but at least the hose, which had a metal tip, is an instrument that could be “used as a weapon.” In re Fortney, 832 N.E.2d at 1268.
The evidence is not clear .as to whether Roell was using the peat-moss planter or hose as weapons. Soham Agarwal testified *492 that he definitely remembered Roell saying that he did not have a weapon. Soham Agarwal testified that Roell “kept saying he didn’t have a weapon. I remember him saying that.” R. 91 (S. Agarwal Dep. at 20) (Page ID #3858). “He kept shouting—he just kept shouting, I don’t have a weapon. That’s all I could hear him saying.” Id. at 37-38 (Page ID #3875-76). Rachana Agarwal testified that she thinks she heard Roell tell the officers that he did not have a weapon. R. 90 (Agarwal Dep. at 75) (Page ID #3830). Huddleston did not recall Roell saying that he did not have a weapon. R. 11 (Huddleston Dep. at 68-69) (Page ID #495-96).
If Roell repeatedly shouted that he did not have a weapon, that indicates that he was not using the hose and peat-moss planter as weapons. Roell’s incoherent mumbling about water also indicates that he was holding the hose because he' was fixated on the Agarwals’ water, not because he planned to use the hose as a weapon. R. 90 (Agarwal Dep. at 60) (Page ID #3815). Of course, neither Roell’s repeatedly shouting that he did not have a weapon, nor his mumbling about water conclusively prove that he was unarmed. But the innocuous nature of a soft, peat-moss planter, the fact that Roell was mumbling about water while holding the hose, and witness testimony that Roell repeatedly shouted that he was unarmed at least create a question of material fact as to whether Roell was using the planter and hose as weapons.
B. We do not know how aggressively Gary Roell was acting
The majority attempts to justify the level of force the officers used by arguing that the situation may have been on the brink of escalating and arguing that Roell was acting aggressively. In fact, it is not clear how aggressively Roell was acting, meaning that it is not clear how much force might have been appropriate under the circumstances. Moreover, neither of these arguments takes into account the obligation to adjust the level of force downward when confronted with an apparently mentally unstable and unarmed individual.
The majority states that there is undisputed evidence of the aggressive nature of the way Roell approached the officers. Maj. Op. at 481-82. In fact, the testimony does not make clear how aggressively Roell was acting when he approached the officers. At least three different witnesses testified in three different ways about why and how Gary Roell approached the officers when he arrived at the Agarwals’ house. Huddleston’s testimony largely mirrored the testimony of the. other officers. He testified that Roell, unprompted, “turned around and started coming toward myself and Deputy Alexander in an aggressive manner.” R. 77 (Huddleston Dep. at 67) (Page ID #494). Huddleston also testified that he did not tell Roell to walk toward him, but rather “told [Roell] to drop what he had in his hands and get on the ground.” Id. at 68 (Page ID #495).
Agarwal was more equivocal. At one point she testified that “I saw the hose and him, you know, running with it towards the officers.” R. 90 (Agarwal Dep. at 38) (Page ID #3793). Later, she testified that she “cannot say that for sure now” whether Roell was running or walking, id. at 44 (Page ID #3799), and “I don’t want to say running, but I saw him going towards the officer with that thing [the hose] in his hand,” id. at 50 (Page ID #3805); see also id. at 56 (Page ID #3811). Agarwal also testified that it was not as if Roell was approaching the officers and they were standing still, but rather that Roell and the officers “were both moving towards each other.” Id. at 42 (Page ID #3796).
*493 In starker contrast to Huddleston’s testimony, Agarwal’s son, Soham Agarwal, recalled that Gary Roell approached the officers because they instructed him to do so. R. 91 (S. Agarwal Dep. at 20) (Page ID #3858). He said:
Q. So after the police officers arrived, what was the first thing you heard either Gary or the officers say to each other?
A. I think the first thing I heard was the officers telling him to like cooperate or to come over there, to stop doing what he was doing when they came into the backyard.
Q. So they said come over to them? Is that what you heard?
A. Something, like that, yes.
Id. at 37-38 (Page ID #3875-76).
In support of its contention that there is undisputed evidence of the aggressive nature of the way Roell approached the officers, the majority states that Soham Agar-wal testified that “Roell was facing the deputies swinging the hose ‘as if he was trying to hit somebody.’ ” Maj. Op. at 477 (quoting R. 91 (S. Agarwal Dep. at 32) (Page ID #3870)). This statement slightly niiseharacterizes Soham Agarwal’s testimony, and, although slight, the difference between Soham Agarwal’s testimony and the majority’s characterization of Soham Agarwal’s testimony is important. Soham Agarwal actually testified that Roell had something in his hand, and that while “it was a little dark still, so it was hard to tell what it was.... it seemed like it was the hose that he had held previously—and that he was kind of like swinging it around, as if he was trying to hit somebody.” R. 91 (S. Agarwal Dep. at 32) (Page ID #3870). Obviously, Soham Agarwal’s testimony does not unequivocally state that Roell was acting in a calm, unaggressive manner, but it also does not unequivocally state that Roell was swinging the hose as if he was trying to hit someone. Instead, Soham Agarwal stated that it was dark enough that it was hard to tell what was happening, that Roell was holding something that “seemed like it was the hose,” and that Roell was “kind of like swinging” whatever he was holding “as if he was trying to hit somebody.” Id. This distinction is important because, along with Rachana Agar-wal’s testimony, it underscores that it was not at all clear to the disinterested wit-nesses_ how aggressively (or unaggressively) Roell was acting.^ It was Huddleston, rather than Soham or Rachana Agarwal, who characterized Roell as aggressive.
The majority also states that although Roell committed only property crimes, it was reasonable for' the officers to infer that his crimes might escalate and therefore reasonable for them to tase him. Maj. Op. at 480-81. First of all, this point is debatable. The only support the majority offers is an unpublished case that is distinguishable because it held that tasing the suspect did not clearly constitute excessive force because the suspect was fleeing. See Cockrell v. City of Cincinnati, 468 Fed.Appx. 491, 498 (6th Cir. 2012) (“[I]t is not clear whether tasing a suspect who fled from the scene of a nonviolent misdemean- or constituted excessive force, as of July 2008.”); see also id. (Cole, C.J., concurring) (“I am persuaded that Cockrell, as of July 3, 2008, did not have a clearly established right not to be tased for fleeing from :a non-violent misdemeanor. I write separately because, given the totality of the circumstances, I believe that Officer Hall’s use of force was excessive.”). Second, even if tasing an unarmed individual is not generally a constitutional violation, that does not change the fact that officers have an obligation to adjust the level of force downward if the individual is apparently mentally unstable and unarmed. Even if an officer generally is permitted to tase an *494 individual who is suspected of committing only misdemeanors, that does not mean that that the officers in this case were permitted to tase Roell, given that he was apparently mentally unstable and may have been unarmed.
The majority also attempts to analogize this case to Cook v. Bastin, 590 Fed.Appx. 523 (6th Cir. 2014), but in doing so notes that in Cook the officers observed Campbell “digging his lacerated fingers into an électrical socket” and “observed the Crisis Manager’s torn and bloody shirt, which they interpreted as an indication that physical violence had occurred.” Maj. Op. at 485. This case is, dissimilar to Cook because the officers observed no signs that violence had occurred, only signs that property damage occurred. In addition, as the majority acknowledges, the officers in Cook used less force than the officers in this case used against Roell. Id.
C. There are disputed facts, making summary judgment inappropriate
Because we do not know whether Gary Roell was unarmed according to Ohio law, we do not know whether the Champion/Martin rule applies to the officers’ confrontation with Roell. See Martin, 712 F.3d at 962 (quoting Champion, 380 F.3d at 904) (officers must “take into account ‘the diminished capacity of an unarmed detainee ... when assessing the amount of force exerted’ ”). Because we do not know how aggressively Roell was acting, we do not know whether the level of force the officers used was appropriate under the circumstances. As a result, summary judgment is not an appropriate resolution of this case. A jury should resolve the disputed, material facts and ultimately determine whether the officers complied with their obligation to adjust the level of force downward. Therefore, as to the majority’s resolution of Nancy Roell’s § 1983 claim against Deputies Alexander, Dalid, and Huddleston, I respectfully dissent.