RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0206p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NANCY ROELL, as executrix of the estate of Gary L. Roell, Sr.,

*Plaintiff-Appellant*,

*v.*

No. 16-4045

HAMILTON COUNTY, OHIO/HAMILTON COUNTY BOARD OF COUNTY COMMISSIONERS; JIM NEIL, in his official capacity as the Hamilton County Sheriff; JOSEPH HUDDLESTON, MATTHEW ALEXANDER, and WILLY DALID, individually and in their official capacities as employees of Hamilton County,

*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:14-cv-00637—Sandra S. Beckwith, District Judge.

Argued: June 13, 2017

Decided and Filed: September 5, 2017

Before: MOORE, GILMAN, and COOK, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH, CO LPA, Cincinnati, Ohio, for Appellant. Pamela Sears, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH, CO LPA, Cincinnati, Ohio, for Appellant. Pamela Sears, Jerome A. Kunkel, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, George D. Jonson, Linda L. Woeber, MONTGOMERY, RENNIE & JONSON, Cincinnati, Ohio, for Appellees.

GILMAN, J., delivered the opinion of the court in which COOK, J., joined. MOORE, J. (pp. 23–29), delivered a separate dissenting opinion.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge.  Gary Roell, who suffered from chronic mental illness, caused a disturbance at his neighbor's condominium while experiencing a condition known as excited delirium.  Hamilton County sheriff's deputies arrived to find Roell half-naked, muttering unintelligibly, and standing next to a broken window holding a hose and the remnants of a hanging plant.  While attempting to subdue Roell, the deputies physically struggled with him and unsuccessfully tased him multiple times.  Roell stopped breathing during the encounter with the deputies and was pronounced dead shortly thereafter.  His death was documented by the coroner as natural, resulting from his excited delirium.

Roell's wife, Nancy Roell, appeals the district court's grant of summary judgment in favor of the individual deputies on her claim under 42 U.S.C. § 1983.  She also appeals the grant of summary judgment in favor of Hamilton County on her claims under both § 1983 and the Americans with Disabilities Act (the ADA).  For the following reasons, we **AFFIRM** the judgment of the district court.

**I.  BACKGROUND**

**A.    Factual background**

Roell suffered from mental illness, including schizoaffective disorder and paranoid delusions, for many years.  Although Roell's symptoms could be successfully controlled by medication, he had a history of noncompliance with his drug regimen.  When he did not take his medication, Roell's mental health deteriorated and his unpredictable behavior rendered him a danger to both himself and to others.

Roell stopped taking his medication in June 2013 and began exhibiting signs of mental decompensation by early August.  Sometime in the late evening hours of August 12 or the early morning hours of August 13, Roell entered a state of excited delirium.  Nancy Roell was out of town during this time, participating in a church mission in New Jersey.  In the midst of his

excited delirium, Roell damaged his and Nancy's condominium by scattering debris, clothes, and other household items inside and around the building. Roell then went to the condominium of his neighbor, Rachana Agarwal, and threw a flower pot through her window.

Agarwal was awakened by the noise of shattering glass and went downstairs to find Roell standing outside of her condominium by the broken window. She attempted to talk to Roell, who was screaming something about "water." Roell then pulled the screen from Agarwal's window and threw it at her. At that point, Agarwal became scared and ran back inside the condominium, where she told her son, Soham, to call 911. Soham dialed 911 and handed the phone to Agarwal, who told the operator that her neighbor was "acting crazy." Agarwal testified that, during this time, Roell appeared to be angry, his face red and his eyes bulging, and he kept muttering unintelligible things about water. Roell was also pacing back and forth in front of Agarwal's broken window, periodically peering into her condominium.

Deputies Matthew Alexander, Willy Dalid, and Joseph Huddleston responded to the dispatch of a "neighbor trouble" call. First to arrive at Agarwal's condominium were Deputies Alexander and Huddleston, who were told by Agarwal that Roell was "in the back breaking things." They entered the gated patio area and saw Roell standing by Agarwal's broken window holding a garden hose with a metal nozzle in one hand and a garden basket in the other. The garden basket was a hanging plant surrounded by peat moss and held together with plastic wire. Roell was wearing a t-shirt but was otherwise naked. According to Deputy Alexander, Roell was screaming "no" and something about water when he and Deputy Huddleston arrived.

Deputy Huddleston proceeded to ask Roell what he was doing. Although Deputy Huddleston could not recall Roell's response, he testified that Roell immediately turned and approached him and Deputy Alexander in an aggressive manner. Roell still had the hose and the garden basket in his hands. Deputy Alexander similarly recalled that he and Deputy Huddleston told Roell to "show us your hands" and that Roell, "immediately, within seconds," charged at them at a "pretty brisk walk." Deputy Alexander also said that Roell approached them still holding the hose and the garden basket.

Soham Agarwal was watching the events unfold from inside the condominium and heard Roell screaming about how "he didn't have water and we had water." In addition, Soham observed the deputies telling Roell to calm down, to stop resisting, to come over to them, and to drop whatever he had in his hands. Soham recalled that Roell repeatedly shouted that he did not have a weapon. But Soham also testified that, despite Roell's assertions that he was unarmed, Roell was facing the deputies swinging the hose "as if he was trying to hit somebody." Rachana Agarwal, also watching from the inside of her condominium, confirmed that the deputies told Roell to calm down and that Roell was swinging the hose nozzle at the deputies. Agarwal observed the deputies and Roell approach each other, with Roell proceeding at a pace between a walk and a sprint, still holding the hose.

As Roell approached the deputies, Deputy Huddleston told Roell to stop and to get on the ground or he would be tased. Deputy Huddleston then unholstered his X2 Taser and arced it as a warning. Arcing a taser does not deploy the device; it simply creates a sound. Roell flinched when Deputy Huddleston arced his taser but kept approaching. Deputy Huddleston once more arced his taser and commanded Roell to get on the ground. Roell again flinched but continued to approach the deputies. Deputy Huddleston then holstered his taser and reached out to grab one of Roell's arms. At the same time, Deputy Alexander grabbed Roell's other arm.

Roell swung the garden basket at Deputy Huddleston as they met. Deputy Huddleston, Deputy Alexander, and Roell all fell to the ground outside of the gated patio area during their struggle. Roell was wet and slippery, either from sweat or water, and managed to break free from the deputies' grasp. As Roell tried to enter back through the patio gate, Deputy Huddleston tased him. Deputy Huddleston testified that taser appeared to have some effect because Roell buckled over a little bit. Roell nonetheless continued into the patio and closed the gate. The deputies followed him through the gate while Deputy Huddleston's taser was still on its five-second deployment cycle. By that time, Deputy Dalid had arrived at the scene. All three deputies tried to restrain Roell's arms, but were unsuccessful because he was combative and thrashing around on the ground. Deputy Alexander testified that he was punched in the face by Roell at some point during the struggle.

While Deputies Alexander and Dalid attempted to hold Roell's arms, Deputy Huddleston tried to deploy his taser in drive-stun mode to the back of Roell's leg. This court has previously explained the use of a taser in drive-stun mode as follows:

> In drive-stun mode, 'the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock . . . [,] but does not cause an override of the victim's central nervous system as it does in dart-mode.'

*Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 (6th Cir. 2012) (quoting *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc)). In deploying his taser in drive-stun mode, Deputy Huddleston hoped to complete the cycle necessary to achieve Roell's neuromuscular incapacitation, believing that one of the barbs from his previous attempt to tase Roell had not connected. The taser failed to incapacitate Roell, however, and he continued to struggle with the deputies on the ground. Deputy Huddleston again holstered his taser and tried to control Roell's legs, while Deputies Alexander and Dalid attempted to control Roell's arms.

Roell managed to escape the grasp of all three deputies and stood up in a face-to-face position with Deputy Alexander, whose back was against a tree. Deputy Huddleston once more tased Roell using the device's dart-mode, this time deploying two barbs into his back. Although the taser still did not take effect, the deputies were able to get Roell on the ground and handcuff him. Because of Roell's continued resistance, the deputies had to restrain Roell's hands in front of his body by using two sets of handcuffs.

Roell appeared "somewhat under control" once he was handcuffed, but he continued to thrash his legs and kicked Deputy Huddleston in the groin. Deputy Huddleston then sent Deputy Alexander to get leg shackles from the one of the patrol cars so that Roell's feet could also be restrained. Once the deputies shackled Roell's legs, they positioned him on his left side. Deputy Dalid was trying to control Roell's upper body by holding on to his right shoulder. Both Deputy Huddleston and Deputy Dalid testified that, once restrained, Roell went limp and began to snore. Roell would wake up, thrash around, and then go limp and lapse back into snoring. Deputy Dalid observed Roell doing this twice before he noticed that Roell had no pulse and had stopped breathing. By that time, Corporal (now Sergeant) Mikal Steers arrived on the scene and began administering CPR to Roell until the life squad arrived. Although Corporal Steers detected a

faint pulse on several occasions, he was unable to revive Roell. The emergency medical technicians were also unable to revive Roell, and he was pronounced dead at the hospital emergency room.

Dr. Jennifer Schott, the deputy coroner, determined that the cause of Roell's death was "excited delirium due to schizoaffective disorder" and that the manner of his death was natural. Included with the Death Record was a report drafted by Dr. Schott, stating that Roell had a history of "physical altercation with police officers" and that the "use of a conducted energy device against decedent" had occurred. Also noted were Roell's various abrasions and contusions, injuries from the taser barbs, and four broken ribs. The report, however, did not find that any of these injuries contributed to Roell's death. In her affidavit, Dr. Schott stated that she performed a microscopic examination of Roell's barb wounds and found no evidence that the conducted energy device used on Roell caused any electrical burns. Nor did Dr. Schott find any evidence that Roell had been asphyxiated, which is consistent with the absence of any evidence that the deputies applied compressive force in attempting to restrain Roell.

**B.      Procedural background**

In August 2014, Nancy Roell, as the executrix of Roell's estate, filed suit in the United States District Court for the Southern District of Ohio against both Hamilton County and the Hamilton County Board of County Commissioners (collectively, Hamilton County), as well as against Sheriff Jim Neil and Deputies Alexander, Dalid, and Huddleston. She first asserted claims pursuant to 42 U.S.C § 1983, alleging that (1) Deputies Alexander, Dalid, and Huddleston violated Roell's Fourth Amendment right to be free from excessive force, and (2) Hamilton County and Sheriff Neil are subject to municipal liability for the deputies' alleged use of excessive force. Nancy Roell also brought intentional-discrimination and failure-to-accommodate claims against all of the defendants under Title II of the ADA. Finally, she asserted a state-law claim for the wrongful death of Roell against all of the defendants and a state-law claim for assault and battery against Deputies Alexander, Dalid, and Huddleston.

In February 2016, the defendants filed a "Motion to Dismiss and Motion for Summary Judgment" pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which the district

court granted in part and denied the remainder as moot. First, the court held that Deputies Alexander, Dalid, and Huddleston were entitled to qualified immunity on Nancy Roell's § 1983 claim, with the result that Sheriff Neil and Hamilton County were also not liable under § 1983. *Roell v. Hamilton Cty. Bd. of Cty. Comm'rs*, No. 1:14-CV-637, 2016 WL 4363112, at *14 (S.D. Ohio Aug. 16, 2016). The court next ruled that Nancy Roell had failed to establish a viable claim under the ADA because she did not produce any evidence that the defendants intentionally discriminated against Roell because of his disability. *Id.* Finally, the court held that Nancy Roell had abandoned her state-law claims against Hamilton County and Sheriff Neil. The court then declined to exercise supplemental jurisdiction over the remaining state-law claims asserted against the individual deputies and therefore denied as moot the defendants' motion to dismiss and/or for summary judgment as to those claims. *Id.*

In rendering its decision, however, the district court did not specify whether it resolved the defendants' motion using the summary-judgment standard or the motion-to-dismiss standard. *Id.* But the content of the defendants' motion, the extensive discovery period, and the court's consideration of materials outside of the pleadings indicate that the case was decided on summary-judgment grounds. In any event, Nancy Roell appeals only the district court's grants of summary judgment in favor of (1) Deputies Alexander, Dalid, and Huddleston on her § 1983 claim, and (2) Hamilton County on her § 1983 and her ADA claims.

## II. ANALYSIS

### A.    Standard of review

We review de novo a district court's grant of summary judgment. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden to "demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Finally, "[i]n

making this assessment, we must view all evidence in the light most favorable to the nonmoving party." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016).

**B.      Nancy Roell's § 1983 claim against Deputies Alexander, Dalid, and Huddleston**

Nancy Roell claims that Deputies Alexander, Dalid, and Huddleston violated Roell's Fourth Amendment rights when they used excessive force to subdue him.  The deputies pled the affirmative defense of qualified immunity, which "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Nancy Roell bears the "ultimate burden of proof" to show that the deputies are not entitled to qualified immunity.  *See Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002).

"We ask two questions in evaluating whether a law-enforcement officer is entitled to qualified immunity on an excessive-force claim: '(1) whether the officer violated the plaintiff's constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident.'" *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) (quoting *Kent v. Oakland County*, 810 F.3d 384, 390 (6th Cir. 2016)).  These questions can be answered in any order.  *Pearson*, 555 U.S. at 236.  In holding that the deputies were entitled to qualified immunity, the district court answered both questions in the negative.  The court concluded that the deputies did not violate Roell's Fourth Amendment rights and that, even if they did, no caselaw clearly established that the degree of force used by the deputies violated such rights.  We will address each of these conclusions in turn.

### 1.   *The deputies likely did not violate Roell's Fourth Amendment rights.*

The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989).  In determining whether an officer has used excessive force in violation of the Fourth Amendment, "we employ an objective-reasonableness test, asking 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Hill*, 853 F.3d at 312 (quoting

*Graham*, 490 U.S. at 397). This test "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).

The Supreme Court has articulated three factors for us to consider in determining the objective reasonableness of a particular use of force. These factors are (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. In evaluating these factors, we must keep in mind that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Finally, although the *Graham* factors are instructive, they "are not an exhaustive list, as the ultimate inquiry is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007) (quoting *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)).

The first *Graham* factor—"the severity of the crime at issue"—supports a finding that some degree of force was justified in order to restrain and arrest Roell. Deputies Alexander, Dalid, and Huddleston responded to a "neighbor trouble" call and were quickly informed by a frightened Agarwal that Roell was "breaking things" in her backyard. They found Roell half-naked, muttering unintelligibly, and standing next to a broken window, which they reasonably inferred was shattered as a result of Roell's actions. In other words, Roell had committed a series of property crimes that a reasonable officer could infer might escalate. The fact that Roell had not yet committed a more serious felony did not preclude the deputies from using force to restrain him. *See Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012) (recognizing numerous cases holding that an officer's use of a taser against a plaintiff who is "actively resisting arrest by physically struggling with, threatening, or disobeying officers" is not a violation of the plaintiff's clearly established Fourth Amendment rights, even if the plaintiff is suspected of committing only a misdemeanor).

Application of the second *Graham* factor—whether Roell posed an immediate threat to the deputies or to others—also indicates that the deputies' use of force was warranted. When the deputies first encountered Roell, he was holding objects that could have been used as weapons amid a scene of property destruction. *See In re Fortney*, 832 N.E.2d 1257, 1268–69 (Ohio Ct. App. 2005) (noting that Ohio law "defines a deadly weapon as 'any instrument, device, or thing capable of inflicting death, and designed or specially adaptable for use as a weapon, or possessed, carried, or used as a weapon'" and recognizing that a stick, when used as a club, can constitute a deadly weapon). The deputies therefore had a reasonable basis to believe that Roell presented an immediate threat to the Agarwals and to the deputies themselves "in light of the facts and circumstances confronting" them. *See Graham*, 490 U.S. at 397.

First, Roell posed a potential threat to the Agarwals, who were still inside the condominium. Because Roell had already thrown a potted plant through the Agarwal's condominium window, the deputies were reasonably concerned that he might break into their residence and cause further destruction. Roell also posed an immediate threat to the deputies themselves. Rahana Agarwal, Soham Agarwal, Deputy Alexander, and Deputy Huddleston all testified that Roell quickly approached the deputies while waving the metal nozzle of a hose in a threatening manner. Deputy Huddleston testified that the hose and the metal nozzle could have been used as a weapon to hit or to choke him.

Although Soham Agarwal heard Roell say that he had no weapon and heard the deputies tell Roell to come over to them, these observations do not create a genuine dispute of material fact as to whether Roell approached the deputies in a manner that posed an immediate threat to their safety. Even if Roell asserted that he was unarmed and moved towards the deputies in response to their commands, the undisputed evidence regarding the aggressive nature of his approach remains unchanged.

Finally, we turn to the third *Graham* factor and analyze whether Roell was actively resisting arrest. Undisputed record evidence shows that Roell resisted the deputies' attempts to restrain and handcuff him by kicking, flailing, and wriggling away from their grasp. Nancy Roell responds that the deputies "foreseeably caused any resistance or escalated the encounter by failing to use verbal and tactical de-escalation." But even if we assume that the deputies

escalated the encounter with Roell—an assertion that we find dubious—law-enforcement officers cannot be held liable solely because they created the circumstances requiring the application of force. *See Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (rejecting the notion that a "Fourth Amendment claim against police officers who used deadly force may survive summary judgment, even where the particular seizure is reasonable, if the defendant police officers acted recklessly in creating the circumstances which required the use of deadly force"). Analysis of the third *Graham* factor therefore supports our conclusion that the deputies were justified in using some degree of force in attempting to restrain Roell.

Our analysis of the *Graham* factors, however, is not the end of the excessive-force inquiry. We must also assess whether the "totality of the circumstances justified" the "particular sort of . . . seizure" imposed upon Roell. *See Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). The totality of the circumstances includes "the fact that at the time of the . . . struggle, the defendant officers had reason to believe that [Roell] was either on drugs or mentally unstable." *See Landis v. Baker*, 297 F. App'x 453, 465 (6th Cir. 2008). Although the officers were unaware that Roell was experiencing an episode of excited delirium, Deputy Huddleston testified that Roell's behavior indicated that he was suffering from some sort of mental illness.

The deputies were therefore required to take into account Roell's diminished capacity before using force to restrain him. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004) ("The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted."). But no caselaw supports Nancy Roell's assertion the deputies were prohibited from using *any* physical force against Roell before first attempting alternative de-escalation techniques. *See Cook v. Bastin*, 590 F. App'x 523, 530 (6th Cir. 2014) (holding that no excessive force was used in handcuffing and physically restraining a man suffering from excited delirium who posed a threat to the law-enforcement officers and who was resisting arrest). In sum, we agree with the district court's observation that "the fact that Roell's resistance was probably caused by his excited delirium did not preclude the deputies from using a reasonable amount of force to bring him under control." *Roell*, 2016 WL 4363112, at *8.

Despite Roell's apparent diminished capacity, he had committed a series of property crimes, was a threat to the Agarwals and to the deputies, and was actively resisting arrest.

"[A] reasonable officer on the scene" could have concluded the use of force was necessary based on the totality of these circumstances. *See Graham*, 490 U.S. at 396. "[T]he question is not whether any force was justified" but, instead, whether the deputies "could reasonably use the *degree* of force employed against" Roell. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (emphasis in original). The type of force employed by the deputies against Roell—physically restraining his limbs, wrestling with him, attempting to tase him, and shackling his arms and legs—was likely not excessive. But we need not definitively answer this question because, at the time of the alleged violation, no caselaw clearly established that the degree of force used by the deputies violated Roell's Fourth Amendment rights.

### 2. The constitutional right alleged by Roell was not clearly established.

"In order for a right to be clearly established for the purposes of qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Estate of Hill v. Miracle*, 853 F.3d 306, 316 (6th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We must therefore determine whether a right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Id.* at 201.

Requiring this "particularized" showing "is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (internal citations omitted). The content of this pre-existing law is determined by looking "first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Champion*, 380 F.3d at 902 (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)). "An action's unlawfulness may be plain 'from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs'" in these cases. *Martin*, 712 F.3d at 961 (quoting *Champion*, 380 F.3d at 902).

With these general principles in mind, we turn to the question at hand: whether Nancy Roell has demonstrated "the prior articulation of a prohibition against the type of excess force exerted" against Roell, sufficient to defeat the deputies' affirmative defense of qualified immunity. *See Champion*, 380 F.3d at 902. We must determine, in other words, whether a reasonable officer would have known that the forcible physical restraint employed in this case against an individual who appeared mentally impaired, yet posed a potential threat to the officers and to others, violated that person's Fourth Amendment rights.

Nancy Roell argues that *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013), demonstrates that the deputies violated Roell's clearly established rights. The decedent in *Martin* broke into an apartment while naked and high on LSD. *Id.* at 954–55. Four police officers arrived on the scene to find Martin speaking quickly and nonsensically. *Id.* Martin calmed down momentarily to ask for help and to be arrested, but then "jogged away" when the officers tried to handcuff him. *Id.* The officers caught up with Martin and fell on top of him. In addition, they delivered "compliance body shots" to Martin's side, struck him in the face with two "hammer punches," kneeled on his calves, struck his face, back, and ribs at least five times, and held Martin in a face-down position. *Id.* at 954–55. Two of the officers heard Martin emit a "gurgling sound" during this struggle and, when they rolled him over, he was unresponsive. *Id.* at 955. Although the coroner determined that Martin died from an acute psychotic episode with excited delirium due to intoxication, a forensic pathologist who conducted Martin's autopsy concluded that asphyxia was the likely cause of his death.

The *Martin* court held that "[a] reasonable officer should have known that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight, head and body strikes, neck or chin restraints, and torso locks would violate that person's clearly established right to be free from excessive force." *Id.* at 693. In doing so, the court observed that the officers were obligated to "de-escalate the situation and adjust the application of force downward" when confronted with an unarmed individual who "exhibited conspicuous signs that he was mentally unstable." *Id.* at 962. We agree with the district court, however, that this statement must be viewed in the context of the officers' applied use of force, which was characterized by the *Martin* court as "severe." *Id.* at 958; *see also Roell*, 2016 WL 4363112 at

*9 ("More reasonably, *Martin* stands for the proposition that officers should try to de-escalate the situation with a mentally disturbed suspect before resorting immediately to severe force to subdue him.").

Unlike the officers in *Martin*, Deputies Alexander, Dalid, and Huddleston did not repeatedly beat Roell or apply compressive body pressure to his back. They instead "grappled with Roell's arms and legs to try to control him, which they eventually did." *Roell*, 2016 WL 4363112 at *9. Deputy Huddleston did attempt to tase Roell, but no electricity was conducted into his body. And although this court has observed that use of a taser entails a higher level of force "than simply knocking someone back to the ground," *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 639 (6th Cir. 2013), a "growing national judicial consensus" exists that the use of a taser in dart mode constitutes only an intermediate use of force. *Bryan v. MacPherson*, 630 F.3d 805, 810 (9th Cir. 2010) (Wardlaw, J., concurring). Martin, moreover, was "unarmed and minimally dangerous," whereas Roell was threateningly waving a hose with a metal nozzle that could be used as a weapon.

Because of these factual differences, *Martin* did not put the deputies on notice that their actions violated Roell's clearly established right to be free from excessive force. Nor do the other cases cited by Nancy Roell, which hold that police use excessive force when they deploy gratuitous force or a taser against an individual who is already restrained or is doing nothing to resist arrest, provide such notice. *See, e.g.*, *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (holding that the police used excessive force when they tased an individual who was suffering from a hypoglycemic episode and whose "noncompliance was not paired with any signs of verbal hostility or physical resistance"); *Landis v. Baker*, 297 F. App'x 453, 461, 464 (6th Cir. 2008) (holding that the police used excessive force against an individual suffering from a mental health crisis who "was not actively resisting arrest or posing a threat to anyone" when they struck him ten times with a baton, held him face down into two feet of mud and water and repeatedly tased him); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (holding that the police used excessive force against a severely autistic man who "stopped resisting arrest and posed no flight risk" when they "sprayed him with pepper spray even after he was immobilized by handcuffs and a hobbling device"). *But see Rudlaff v. Gillispie*, 791 F.3d

638, 641 (6th Cir. 2015) (collecting cases and concluding that [o]ur cases firmly establish that it is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest." (emphasis in original)).

We believe that this case is instead more analogous to *Cook v. Bastin*, 590 F. App'x 523 (6th Cir. 2014). In that case, a severely autistic man became agitated, stripped naked, caused extensive property damage to his room in an adult daycare center, and ripped the shirt of the daycare center's Crisis Manager. *Id.* at 525. The police arrived to find the man, Roland Campbell, digging his lacerated fingers into an electrical socket. They observed the Crisis Manager's torn and bloody shirt, which they interpreted as an indication that physical violence had occurred. The officers were told that Campbell was out-of-control, suffered from mental disabilities, and needed to be taken to a mental facility.

Campbell was handcuffed without incident and placed in a sitting position. While the police waited for the medical transport unit, however, Campbell "began thrashing and kicking, making grunting sounds as he tried to free himself from the handcuffs," rolled onto a prone position, and began scooting on his stomach towards the doorway. *Id.* at 526. The officers attempted to gain control of Campbell by restraining his arms and legs, while the Crisis Manager held his torso. During the struggle, Campbell pulled the men into the hallway, freed one of his hands from the cuffs, and "pick[ed] himself and everybody up off the ground with the one hand about three or four inches." *Id.* Campbell then collapsed, fell unconscious, and died as a result of acute cardiorespiratory failure. The *Cook* court held that the degree of force used by the officers was reasonable because Campbell had committed significant property destruction and a physical assault, posed an immediate threat to himself, the officers, and to others, and attempted to free himself from the officers' restraint. *Id.* at 530–31.

Like Campbell, Roell caused significant property damage, was a threat to the officers and to others, and resisted arrest during an episode of excited delirium. Although Deputies Alexander, Dalid and Huddleston did not observe any "signs of physical violence," they did observe that Roell was holding objects that could be used as weapons. True enough, the deputies' wrestled with and attempted to tase Roell, arguably deploying a higher level of force than the officers in *Campbell*. But this court has previously held that an officer's "single use of

the taser in drive-stun mode" against a mentally unstable plaintiff who was a threat to officer safety and his own safety, and who was resisting police attempts to transport him to the hospital, did not constitute excessive force. *See Caie v. West Bloomfield Township*, 485 F. App'x 92, 94–96 (6th Cir. 2012). And there is no question that the degree of force employed by Deputies Alexander, Dalid, and Huddleston was far less than the unconstitutionally severe force used by the officers in *Martin*. In sum, the relevant caselaw does not clearly establish that the deputies violated Roell's Fourth Amendment rights because their actions fell in the "hazy border between excessive and acceptable force." *See Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (quoting *Saucier*, 533 U.S. at 206).

Finally, Nancy Roell relies on the procedures articulated in the training materials of the Ohio Peace Officer Training Commission (OPTC) and in proffered expert testimony in an effort to prove that Roell's right to be free from excessive force was clearly established. She first argues that the deputies did not follow the OPTC procedures when they neglected to recognize that Roell was exhibiting the common symptoms of excited delirium, proceeded to engage Roell before staging the scene with multiple officers and medical personnel, and failed to use verbal de-escalation techniques before attempting to physically restrain him. Nancy Roell also points to the expert testimony of Dr. Michael Lyman, who stated that de-escalation was the "standard technique" recommended for crime-related encounters with excited-delirium subjects and who opined that, had the deputies used verbal de-escalation, Roell would have likely been talked into surrendering without an altercation. Based on this evidence, Nancy Roell argues that the deputies had a "clearly established duty" to use de-escalation techniques prior to using force against Roell.

In considering her argument, we must "evaluate the officers' use of certain tactics 'in light of testimony regarding the training that [the officers] received.'" *Martin*, 712 F.3d at 960 (quoting *Griffith v. Coburn*, 473 F.3d 650, 657 (6th Cir. 2007)). But we also must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. A finding of qualified immunity is therefore not precluded simply because the deputies acted contrary to their training. *City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) ("Even if an officer

acts contrary to her training, however, . . . that does not itself negate qualified immunity where it would otherwise be warranted."). In addition, although the deputies did not follow every OPTC protocol, we note that the training materials acknowledge that the use of a taser might be effective in controlling an individual suffering from excited delirium, that a physical struggle might ensue, and that force might be appropriate or necessary in order to restrain the individual.

Dr. Lyman's expert testimony, which essentially opines on the best approach that the deputies could have taken in ideal circumstances, similarly does not establish that the deputies violated Roell's clearly established rights. As an initial matter, "[t]he Fourth Amendment . . . does not require police officers to take the better approach[,] . . . only that they take a reasonable approach." *Cook v. Bastin*, 590 F. App'x 523, 528 (6th Cir. 2014). And "so long as 'a reasonable officer could have believed that his conduct was justified,' a plaintiff cannot 'avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.'" *Sheehan*, 135 S. Ct. at 1777 (quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002)).

In sum, Nancy Roell points to no caselaw clearly establishing that the deputies violated Roell's Fourth Amendment rights in effectuating his arrest. Even assuming that law-enforcement officers must "adjust the application of force downward" when confronted with a conspicuously mentally unstable arrestee, *Martin*, 712 F.3d at 962, no precedent establishes that the level of force used by the deputies in this case was excessive or that the deputies were required to use only verbal de-escalation techniques. The content of the OPTC training material and Nancy Roell's proffered expert testimony do not change our conclusion. Deputies Alexander, Dalid, and Huddleston are therefore entitled to qualified immunity, meaning that the district court did not err in granting summary judgment to the them on Nancy Roell's § 1983 claim.

## C.     Nancy Roell's § 1983 claim against Hamilton County

Nancy Roell also challenges the district court's grant of summary judgment in favor of Hamilton County on her claim for municipal liability under § 1983. She put forth three theories as to why Hamilton County is subject to municipal liability: (1) Hamilton County's policy and

custom for handling mentally-ill individuals was the driving force behind the deputies' use of excessive force, (2) Hamilton County failed to adequately train the deputies, and (3) Hamilton County ratified the deputies' use of excessive force.

We recognize that "[a] municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004). The district court held that Deputies Alexander, Dalid, and Huddleston did not violate Roell's Fourth Amendment rights under the first prong of the qualified-immunity analysis. It therefore granted summary judgment in favor of Hamilton County based on that ground and did not address any of Nancy Roell's theories for municipal liability.

We, on the other hand, have utilized the *second* prong of the qualified-immunity analysis to conclude that the deputies are entitled to summary judgment because no caselaw clearly established that the degree of force used by the deputies violated Roell's Fourth Amendment rights. In doing so, we have reached no conclusion with respect to whether Roell's rights were actually violated. We must therefore address Nancy Roell's three theories for Hamilton County's liability by assuming, without deciding, that Roell's Fourth Amendment rights were violated by the deputies' excessive use of force.

Hamilton County is subject to liability under § 1983 for its policy on handling mentally ill individuals only if Nancy Roell can "demonstrate 'a direct causal link between the policy and the alleged constitutional violation.'" *See Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (quoting *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004)). But Nancy Roell does not point to any policy that is the "moving force" behind the deputies' actions. *See id.* She instead argues that Hamilton County's *lack* of adequate policies and training caused the deputies' use of excessive force.

Inadequate training can serve as the basis for municipal liability under § 1983 where it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To succeed on this claim, Nancy Roell "must show '(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [County's] deliberate indifference; and

(3) that the inadequacy is closely related to or actually caused the plaintiff's injury.'" *Brown*, 814 F.3d at 463 (quoting *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)). Nancy Roell cannot meet the first prong of this test, however, because Hamilton County had a satisfactory training program in place regarding officer interactions with individuals suffering from mental illness and excited delirium.

The record shows that the deputies received training on topics that included the use of force and tasers, crisis intervention techniques, interacting with the special-needs population and mentally ill suspects, and recognizing the symptoms of excited delirium. Finally, we note that Nancy Roell's argument that Hamilton County failed to train its deputies is completely inconsistent with her § 1983 claim that the deputies' use of excessive force was evidenced by the fact that they *failed to follow* Hamilton County's procedures regarding officer interactions with individuals suffering from excited delirium.

This leaves Nancy Roell with her argument that Hamilton County ratified the use of excessive force by Deputies Alexander, Dalid, and Huddleston when it conducted an inadequate investigation of the events. Specifically, she asserts that the investigation merely rubber-stamped the deputies' unconstitutional conduct, neglected to discover what actually took place, and failed to review whether the deputies' actions violated Hamilton County's policies and procedures. Once again, however, the record demonstrates otherwise.

The internal investigation included interviews of multiple witnesses, detailed fact-finding, and incorporates additional investigations by the Criminal Investigations Unit of the Sheriff's Office and the Hamilton County Coroner. In addition, Nancy Roell's own expert, Dr. Lyman, testified that he could not think of any additional interviews that should have been conducted during the investigation, could not point to any physical evidence that was not preserved or test results that were not considered, and could not identify any specific inadequacies in the collection of testimonial or tangible evidence. We therefore disagree with Nancy Roell's argument that "no serious investigation" occurred regarding the deputies' use of force. *See Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985). Because Hamilton County is not subject to municipal liability under any of her theories, the district court did not err in granting summary judgment to the county on her § 1983 claim.

**D.     Nancy Roell's ADA claim against Hamilton County**

Finally, Nancy Roell appeals the district court's grant of summary judgment in favor of Hamilton County based on her claim under Title II of the ADA.  Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Two types of claims are cognizable under Title II:  claims for intentional discrimination and claims for a reasonable accommodation.  *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004).

The district court dismissed Nancy Roell's ADA claim because it found no evidence that the defendants intentionally discriminated against Roell based on his disability.  In so holding, however, the court failed to consider Nancy Roell's failure-to-accommodate theory.  Under this theory, Nancy Roell asserted that Hamilton County had a duty to accommodate Roell's disability by "having its officers take steps to calm the situation, converse with Mr. Roell in a non-threatening manner, pause to gather information from Rachana Agarwal, refrain from the application of force, and summon EMS to the scene at the earliest moment possible."

Neither the Supreme Court nor this circuit has squarely addressed whether Title II of the ADA applies in the context of an arrest.  Nancy Roell urges us, however, to adopt the reasoning of several of our sister circuits that have found Title II applicable to law-enforcement activities, including arrests.

A few opinions have indeed indicated that arrestees might be able to bring cognizable claims under Title II.  But, in doing so, they have also noted that the exigent circumstances inherent in an arrest inform the reasonable-accommodation analysis.  *See, e.g.*, *Sheehan v. City of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part*, 135 S. Ct. 1765 (2015) (holding that "the ADA . . . applies to arrests, though we agree with the Eleventh and Fourth Circuits that exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment"); *Bahl v. County of Ramsey*, 695 F.3d 778, 784 (8th Cir. 2012) (noting that "[e]ven if the ADA

applied to [a] traffic stop," the defendant police officer was not required to accommodate the plaintiff's disability "under the exigencies of the traffic stop"). *But see Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000) ("Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life.").

We need not decide whether Title II applies in the context of arrests because, even if Nancy Roell's failure-to-accommodate claim is cognizable, Hamilton County is entitled to summary judgment based on the facts of this case. This circuit has previously held that "the 'determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry.'" *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015) (quoting *Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 844 (9th Cir. 2004)). Deputies Alexander, Dalid, and Huddleston unquestionably faced exigent circumstances while attempting to restrain and arrest Roell. As detailed above, they responded to an unsecured scene to find an individual who had committed, at the very least, a series of property crimes and who posed a continuing threat to the deputies and to others. In fact, almost immediately after the deputies arrived, Roell swiftly approached them brandishing a hose with a metal nozzle and a garden basket. The deputies, in other words, were required to make a series of quick, on-the-spot judgments in a continuously evolving environment.

Nancy Roell's proposed accommodations—that the deputies use verbal de-escalation techniques, gather information from the witnesses, and call EMS services before engaging with Roell—were therefore "unreasonable . . . in light of the overriding public safety concerns." *See Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2008), *abrogated on other grounds by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015); *cf. Hainze*, 207 F.3d at 802 (recognizing that "[o]nce the area was secure and there was no threat to human safety, the . . . Sheriff's deputies would have been under a duty to reasonably accommodate [plaintiff's] disability in handling and transporting him to a mental health facility").

In the context of the exigent circumstances surrounding Roell's arrest, Nancy Roell cannot make out a viable ADA claim under her failure-to-accommodate theory. Nor has she

presented any evidence that Hamilton County intentionally discriminated against Roell based on his disability.  The district court therefore did not err in granting summary judgment in favor of Hamilton County on Nancy Roell's ADA claim.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

––––––––––––––––––––

**DISSENT**

––––––––––––––––––––

KAREN NELSON MOORE, Circuit Judge, dissenting. Our circuit law clearly states that when an individual "exhibit[s] conspicuous signs that he [is] mentally unstable" and is "unarmed," "*Champion* require[s] the officers to de-escalate the situation and adjust the application of force downward." *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004)). There are disputed facts as to whether Roell was unarmed and as to how aggressively Roell was acting, which determine how much force was appropriate. Although the law governing this case is clear, the facts surrounding Roell's death are not. The district court erred by granting summary judgment on Nancy Roell's § 1983 claim against Deputies Alexander, Dalid, and Huddleston. I would reverse summary judgment on this claim, and I respectfully dissent.

### I. GOVERNING LAW

Because the law governing this case is clearly established and straightforward, I begin by setting out the basic legal principles that govern this case. First, I agree with the majority's recitation of the familiar summary-judgment standard, although not with its application of the standard to this case. *See* Maj. Op. at 7–8. Second, I agree with its summary of the *Graham* factors. *See* Maj. Op. at 8–9 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

As for the law at the heart of this matter, I cannot agree with the majority's characterization. Sixth Circuit cases clearly establish that officers must "take into account 'the diminished capacity of an unarmed detainee . . . when assessing the amount of force exerted.'" *Martin*, 712 F.3d 962 (quoting *Champion*, 380 F.3d at 904). *Martin* states the rule very simply: When an individual "exhibit[s] conspicuous signs that he [is] mentally unstable" and is "unarmed," "*Champion* require[s] the officers to de-escalate the situation and adjust the application of force downward." *Id.*; *see also Landis v. Baker*, 297 F. App'x 453, 465 (6th Cir. 2008) ("A determination of the reasonableness of the defendant officers' conduct must take into account the fact that at the time of the fatal struggle, the defendant officers had reason to believe

that [the arrestee] was either on drugs or mentally unstable and they knew that he was unarmed."). If it is apparent to officers that an individual is unarmed and mentally unstable, then the officers must de-escalate and may not use as much force as would be permissible when confronted with an individual who was either mentally stable or armed.

While the majority acknowledges that *Champion* mandates that "[t]he deputies were . . . required to take into account Roell's diminished capacity before using force to restrain him," it essentially brushes this requirement aside by asserting that "no caselaw supports Nancy Roell's assertion the deputies were prohibited from using *any* physical force against Roell before first attempting alternative de-escalation techniques." Maj. Op. at 11. I agree that the deputies were not necessarily prohibited from using any physical force on Gary Roell, but that point is irrelevant to this case. The question in this case is whether the officers complied with their obligation, under *Champion* and *Martin*, to adjust their use of force downward. Even if the officers were permitted to use some physical force, they could have violated *Champion* and *Martin* by failing to adjust the level of force downward.

## II. APPLICATION OF THE CLEARLY ESTABLISHED LAW TO THE FACTS OF THIS CASE

There are several unresolved questions of fact relevant to whether the officers had, and, if so, whether they complied with, an obligation to adjust the level of force downward. There are some basic facts that I agree are not in dispute. No one disputes that Roell had long lived with chronic, severe mental illness, including schizoaffective disorder and delusional disorder, nor does anyone dispute that when he went off his medication he could become unpredictable, dangerous, and violent. R. 98 (N. Roell Dep. at 72, 97, 167) (Page ID #4513, 4538, 4608). No one disputes that at 2:30 a.m. on August 13, the Roells' neighbor, Rachana Agarwal, woke up to a loud noise and found Roell standing at Agarwal's window wearing only a t-shirt, nude from the waist down. R. 90 (Agarwal Dep. at 10) (Page ID #3765); R. 77 (Huddleston Dep. at 66) (Page ID #493). Scared, Agarwal called 911 and said that her neighbor was "acting crazy." R. 90 (Agarwal Dep. at 27) (Page ID #3782). There is no dispute that when the officers arrived on the scene, they wrestled with Roell and tased him multiple times before eventually subduing him and handcuffing him with two sets of handcuffs and shackles. R. 77 (Huddleston Dep. at 98–100,

117–19) (Page ID #525–27, 544–46).   There is also no dispute that Roell stopped breathing while he was shackled, that he never regained consciousness, and that he was pronounced dead at the hospital.  *See* R. 96-1 (Death Record) (Page ID #4286).

Beyond these basic facts, there are many disputes over important details of the events leading to Roell's death.  First, there is a fact question as to whether Roell was armed, given that he was holding a hose and a hanging planter but may not have been using these items as weapons.   Second, there is a fact question as to how aggressively Roell acted when he approached the officers.   Without resolving these factual disputes, it is impossible to know whether the amount of force was appropriate under the circumstances.

**A.  We do not know whether Gary Roell was unarmed**

There is a fact question as to whether Roell was unarmed under Ohio law.  Determining whether Roell was unarmed is crucial, because if Roell was unarmed, the *Champion*/*Martin* rule would apply and require the officers to adjust the level of force downward.  If Roell was armed, the *Champion*/*Martin* rule would not apply.

The majority correctly notes that Ohio law "defines a deadly weapon as 'any instrument, device, or thing capable of inflicting death, and designed or specially adaptable for use as a weapon, or possessed, carried, or used as a weapon.'"  Maj. Op. at 10 (quoting *In re Fortney*, 832 N.E.2d 1257, 1268 (Ohio Ct. App. 2005)).  The hose and peat-moss hanging planter are not instruments "designed or specially adaptable for use as a weapon" but at least the hose, which had a metal tip, is an instrument that could be "used as a weapon." *In re Fortney*, 832 N.E.2d at 1268.

The evidence is not clear as to whether Roell was using the peat-moss planter or hose as weapons.  Soham Agarwal testified that he definitely remembered Roell saying that he did not have a weapon.  Soham Agarwal testified that Roell "kept saying he didn't have a weapon.  I remember him saying that."  R. 91 (S. Agarwal Dep. at 20) (Page ID #3858).  "He kept shouting -- he just kept shouting, I don't have a weapon.  That's all I could hear him saying." *Id.* at 37–38 (Page ID #3875–76).  Rachana Agarwal testified that she thinks she heard Roell tell the officers that he did not have a weapon.  R. 90 (Agarwal Dep. at 75) (Page ID #3830).  Huddleston did not

recall Roell saying that he did not have a weapon. R. 77 (Huddleston Dep. at 68–69) (Page ID #495–96).

If Roell repeatedly shouted that he did not have a weapon, that indicates that he was not using the hose and peat-moss planter as weapons. Roell's incoherent mumbling about water also indicates that he was holding the hose because he was fixated on the Agarwals' water, not because he planned to use the hose as a weapon. R. 90 (Agarwal Dep. at 60) (Page ID #3815). Of course, neither Roell's repeatedly shouting that he did not have a weapon, nor his mumbling about water conclusively prove that he was unarmed. But the innocuous nature of a soft, peat-moss planter, the fact that Roell was mumbling about water while holding the hose, and witness testimony that Roell repeatedly shouted that he was unarmed at least create a question of material fact as to whether Roell was using the planter and hose as weapons.

**B. We do not know how aggressively Gary Roell was acting**

The majority attempts to justify the level of force the officers used by arguing that the situation may have been on the brink of escalating and arguing that Roell was acting aggressively. In fact, it is not clear how aggressively Roell was acting, meaning that it is not clear how much force might have been appropriate under the circumstances. Moreover, neither of these arguments takes into account the obligation to adjust the level of force downward when confronted with an apparently mentally unstable and unarmed individual.

The majority states that there is undisputed evidence of the aggressive nature of the way Roell approached the officers. Maj. Op. at 10. In fact, the testimony does not make clear how aggressively Roell was acting when he approached the officers. At least three different witnesses testified in three different ways about why and how Gary Roell approached the officers when he arrived at the Agarwals' house. Huddleston's testimony largely mirrored the testimony of the other officers. He testified that Roell, unprompted, "turned around and started coming toward myself and Deputy Alexander in an aggressive manner." R. 77 (Huddleston Dep. at 67) (Page ID #494). Huddleston also testified that he did not tell Roell to walk toward him, but rather "told [Roell] to drop what he had in his hands and get on the ground." *Id.* at 68 (Page ID #495).

Agarwal was more equivocal. At one point she testified that "I saw the hose and him, you know, running with it towards the officers." R. 90 (Agarwal Dep. at 38) (Page ID #3793). Later, she testified that she "cannot say that for sure now" whether Roell was running or walking, *id.* at 44 (Page ID #3799), and "I don't want to say running, but I saw him going towards the officer with that thing [the hose] in his hand," *id.* at 50 (Page ID #3805); *see also id.* at 56 (Page ID #3811). Agarwal also testified that it was not as if Roell was approaching the officers and they were standing still, but rather that Roell and the officers "were both moving towards each other." *Id.* at 42 (Page ID #3796).

In starker contrast to Huddleston's testimony, Agarwal's son, Soham Agarwal, recalled that Gary Roell approached the officers because they instructed him to do so. R. 91 (S. Agarwal Dep. at 20) (Page ID #3858). He said:

> Q.    So after the police officers arrived, what was the first thing you heard either Gary or the officers say to each other?
> A.    I think the first thing I heard was the officers telling him to like cooperate or to come over there, to stop doing what he was doing when they came into the backyard.
> Q.    So they said come over to them? Is that what you heard?
> A.    Something like that, yes.

*Id.* at 37–38 (Page ID #3875–76).

In support of its contention that there is undisputed evidence of the aggressive nature of the way Roell approached the officers, the majority states that Soham Agarwal testified that "Roell was facing the deputies swinging the hose 'as if he was trying to hit somebody.'" Maj. Op. at 4 (quoting R. 91 (S. Agarwal Dep. at 32) (Page ID #3870)). This statement slightly mischaracterizes Soham Agarwal's testimony, and, although slight, the difference between Soham Agarwal's testimony and the majority's characterization of Soham Agarwal's testimony is important. Soham Agarwal actually testified that Roell had something in his hand, and that while "it was a little dark still, so it was hard to tell what it was. . . . it seemed like it was the hose that he had held previously -- and that he was kind of like swinging it around, as if he was trying to hit somebody." R. 91 (S. Agarwal Dep. at 32) (Page ID #3870). Obviously, Soham Agarwal's testimony does not unequivocally state that Roell was acting in a calm, unaggressive

manner, but it also does not unequivocally state that Roell was swinging the hose as if he was trying to hit someone. Instead, Soham Agarwal stated that it was dark enough that it was hard to tell what was happening, that Roell was holding something that "*seemed like* it was the hose," and that Roell was "*kind of like* swinging" whatever he was holding "as if he was trying to hit somebody." *Id.* This distinction is important because, along with Rachana Agarwal's testimony, it underscores that it was not at all clear to the disinterested witnesses how aggressively (or unaggressively) Roell was acting. It was Huddleston, rather than Soham or Rachana Agarwal, who characterized Roell as aggressive.

The majority also states that although Roell committed only property crimes, it was reasonable for the officers to infer that his crimes might escalate and therefore reasonable for them to tase him. Maj. Op. at 9. First of all, this point is debatable. The only support the majority offers is an unpublished case that is distinguishable because it held that tasing the suspect did not clearly constitute excessive force because the suspect was fleeing. *See Cockrell v. City of Cincinnati*, 468 F. App'x 491, 498 (6th Cir. 2012) ("[I]t is not clear whether tasing a suspect who fled from the scene of a nonviolent misdemeanor constituted excessive force, as of July 2008."); *see also id.* (Cole, C.J., concurring) ("I am persuaded that Cockrell, as of July 3, 2008, did not have a clearly established right not to be tased for fleeing from a non-violent misdemeanor. I write separately because, given the totality of the circumstances, I believe that Officer Hall's use of force was excessive."). Second, even if tasing an unarmed individual is not generally a constitutional violation, that does not change the fact that officers have an obligation to adjust the level of force downward if the individual is apparently mentally unstable and unarmed. Even if an officer generally is permitted to tase an individual who is suspected of committing only misdemeanors, that does not mean that that the officers in this case were permitted to tase Roell, given that he was apparently mentally unstable and may have been unarmed.

The majority also attempts to analogize this case to *Cook v. Bastin*, 590 F. App'x 523 (6th Cir. 2014), but in doing so notes that in *Cook* the officers observed Campbell "digging his lacerated fingers into an electrical socket" and "observed the Crisis Manager's torn and bloody shirt, which they interpreted as an indication that physical violence had occurred." Maj. Op. at

15.  This case is dissimilar to *Cook* because the officers observed no signs that violence had occurred, only signs that property damage occurred.  In addition, as the majority acknowledges, the officers in *Cook* used less force than the officers in this case used against Roell.  *Id.*

**C.  There are disputed facts, making summary judgment inappropriate**

Because we do not know whether Gary Roell was unarmed according to Ohio law, we do not know whether the *Champion*/*Martin* rule applies to the officers' confrontation with Roell.  *See Martin*, 712 F.3d at 962 (quoting *Champion*, 380 F.3d at 904) (officers must "take into account 'the diminished capacity of an unarmed detainee . . . when assessing the amount of force exerted'").  Because we do not know how aggressively Roell was acting, we do not know whether the level of force the officers used was appropriate under the circumstances.  As a result, summary judgment is not an appropriate resolution of this case.  A jury should resolve the disputed, material facts and ultimately determine whether the officers complied with their obligation to adjust the level of force downward.  Therefore, as to the majority's resolution of Nancy Roell's § 1983 claim against Deputies Alexander, Dalid, and Huddleston, I respectfully dissent.